**Floye MILLER, et al.,**

**v.**

**Margaret M. HECKLER, Secretary of the Department of Health and Human Services, et al.**

**No. TY–84–453–CA.**

United States District Court,
E.D. Texas,
Tyler Division.

Feb. 5, 1985.

**1472**

Frank H. Case III, Bruce R. Gilbert, Case & Cohen, Washington, D.C., Michael L. Sampson, Steves & Leonard, Fort Worth, Tex., for plaintiffs.

Robert J. Wortham, U.S. Atty., Ruth Harris, Asst. U.S. Atty., Tyler, Tex., Amy Yourman, Atty., Office of the General Counsel, Dept. of Health and Human Services, Washington, D.C., for defendants.

## ORDER OF DISMISSAL FOR LACK OF SUBJECT MATTER JURISDICTION

STEGER, District Judge.

The plaintiffs in this action comprise two separate and distinct groups. The first consists of residents of various Texas nursing homes who have been denied coverage for durable medical equipment under Part B of Title XVIII of the Social Security Act ("Medicare Part B"). The second group includes several durable medical equipment suppliers that provided equipment to those people in the first group. The defendants are Margaret M. Heckler, Secretary of the United States Department of Health and Human Services, and Carolyne K. Davis, Administrator of the Health Care Financing Administration (HCFA) of the Department of Health and Human Services. (The HCFA has been delegated the responsibility of administering the Medicare program.) The plaintiffs seek declaratory, injunctive and mandamus relief to halt the defendants' allegedly unlawful denial of Medicare Part B coverage for the named plaintiffs and others similarly situated. For the reasons delineated below, the Court believes that this action should be dismissed for lack of jurisdiction over the subject matter.

### I. BACKGROUND

The Medicare program was enacted in 1965 to furnish federal health insurance to the elderly and disabled. Part A of the Medicare Act, 42 U.S.C.S. §§ 1395c *et seq.* (Law.Co-op.1973 & Supp.1984), provides insurance for the cost of hospital and related post-hospital services. On the other hand, Part B of the Medicare Act, 42 U.S.C.S. §§ 1395j *et seq.* (Law.Co-op.1973 & Supp. 1984), establishes a voluntary program of supplemental medical insurance covering expenses not comprehended by the Part A program, including the costs of durable medical equipment.

Part B is funded in part by monthly premiums paid by beneficiaries, with matching federal government contributions making up the remainder of the budget. 42 U.S.C.S. §§ 1395j, 1395r, 1395s (Law.Co-op.1973 & Supp.1984). Part B benefits are

paid through private insurance carriers under contract with the Department of Health and Human Services ("HHS"). 42 U.S.C.S. § 1395u (Law.Co-op.1973 & Supp. 1984). Medicare pays 80 per cent of reasonable charges for covered services, while the beneficiary pays the remaining 20 per cent. 42 U.S.C.S. §§ 1395*l* (a)(1), 1395*l* (f)(1)–(4) (Law.Co-op.1973 & Supp.1984).

Part B pays for durable medical equipment that is used in a patient's home, including an institution such as a nursing facility that the patient uses as his home. 42 U.S.C.S. § 1395x(n) (Law.Co-op.Supp. 1985).[1] The term "home" is never fully defined.

The issue in this case is not what a home is, however, but what a home is not. Part B will not pay for durable medical equipment if the patient lives in "an institution ... that meets the requirements of subsection (e)(1) or (j)(1) of this section [§ 1395x] ...." 42 U.S.C.S. § 1395x(n). The question in this case is what type of institution meets the requirements of subsection (j)(1).

Section 1395x defines the services and institutions covered by Medicare. Subsection (j)(1) of section 1395x, is the first part of the definition of the term "skilled nursing facility" contained in subsection (j). 42 U.S.C.S. § 1395x(j) (Law.Co-op.1973 & Supp.1984) (hereafter referred to as § 1395x(j).)[2] (Many HHS documents refer

1. 42 U.S.C.S. § 1395x(n) provides that:

(n) The term "durable medical equipment", includes iron lungs, oxygen tents, hospital beds, and wheelchairs (which may include a power-operated vehicle that may be appropriately used as a wheelchair, but only where the use of such a vehicle is determined to be necessary on the basis of the individual's medical and physical condition and the vehicle meets such safety requirements as the Secretary may prescribe) used in the patient's home (including an institution used as his home other than an institution that meets the requirements of subsection (e)(1) or (j)(1) of this section), whether furnished on a rental basis or purchased.

2. 42 U.S.C.S. § 1395x(j) provides that:

Skilled nursing facility. The term "skilled nursing facility" means (except for purposes of subsection (a)(2)) an institution (or a distinct part of an institution) which has in effect a transfer agreement (meeting the requirements of subsection (1)) with one or more hospitals having agreements in effect under section 1866 [42 USCS § 1395cc] and which—

(1) is primarily engaged in providing to inpatients (A) skilled nursing care and related services for patients who require medical or nursing care, or (B) rehabilitation services for the rehabilitation of injured, disabled, or sick persons;

(2) has policies, which are developed with the advice of (and with provision of review of such policies from time to time by) a group of professional personnel, including one or more physicians and one or more registered professional nurses, to govern the skilled nursing care and related medical or other services it provides;

(3) has a physician, a registered professional nurse, or a medical staff responsible for the execution of such policies;

(4)(A) has a requirement that the health care of every patient must be under the supervision of a physician, and (B) provides for having a physician available to furnish necessary medical care in case of emergency;

(5) maintains clinical records on all patients;

(6) provides 24-hour nursing service which is sufficient to meet nursing needs in accordance with the policies developed as provided in paragraph (2), and has at least one registered professional nurse employed full time;

(7) provides appropriate methods and procedures for the dispensing and administering of drugs and biologicals;

(8) has in effect a utilization review plan which meets the requirements of subsection (k);

(9) in the case of an institution in any State in which State or applicable local law provides for the licensing of institutions of this nature, (A) is licensed pursuant to such law, or (B) is approved, by the agency of such State or locality responsible for licensing institutions of this nature, as meeting the standards established for such licensing;

(10) has in effect an overall plan and budget that meets the requirements of subsection (z);

(11) complies with the requirements of section 1124 [42 USCS § 1320a–3];

(12) cooperates in an effective program which provides for a regular program of independent medical evaluation and audit of the patients in the facility to the extent required by the programs in which the facility participates (including medical evaluation of each patient's need for skilled nursing facility care);

(13) meets such provisions of such edition (as is specified by the Secretary in regulations) of the Life Safety Code of the National Fire Protection Association as are applicable to nursing homes; except that the Secretary

to § 1395x(j) as § 1861(j), using the section number from the Social Security Act.) In short, patients residing in facilities that provide skilled nursing care (§ 1395x(j)(1) facilities) are not entitled to Part B coverage for durable medical equipment.

Therein lies the problem. Plaintiffs in the first group reside in nursing homes formerly classified solely as intermediate care facilities—and therefore entitled to Part B coverage for medical equipment—that were reclassified as skilled nursing facilities for Part B benefit purposes effective September 1, 1984. The reclassification resulted from HCFA's interpretation of the Medicare Act. In order to be certified as a "skilled nursing facility," a nursing home must meet all fifteen requirements of subsection (j). 42 U.S.C.S. 1395x(j)(1)–(15). Patients in homes meeting the fifteen requirements for skilled nursing facilities are eligible for benefits under Part A of the Medicare Act. Residents of all other nursing homes are eligible for Part B coverage for items such as durable medical equipment unless their home provides "skilled nursing care," which is merely the first of the fifteen requirements in subsection (j). 42 U.S.C.S. §§ 1395x(j)(1); 1395x(n). Since section 1395x(n), the section providing coverage for medical equipment, only refers to (j)(1), the first of the fifteen criteria, HHS believes that a nursing home can provide skilled nursing care (as defined in (j)(1)) and still not be a skilled nursing facility (as defined in (j)(1) through (15)). If patients receive skilled nursing care, they are not eligible for Part B coverage for durable medical equipment.

The reclassification of Texas nursing homes that is now under attack allegedly was necessitated by the former lax enforcement in HCFA Region VI of the statutory interpretation outlined above. (HCFA Region VI is responsible for overseeing the Medicare program in Texas as well as Ar-

---

may waive, for such periods as he deems appropriate, specific provisions of such Code which if rigidly applied would result in unreasonable hardship upon a nursing home, but only if such waiver will not adversely affect the health and safety of the patients; except that the provisions of such Code shall not apply in any State if the Secretary finds that in such State there is in effect a fire and safety code, imposed by State law, which adequately protects patients in nursing facilities;

(14) establishes and maintains a system that (A) assures a full and complete accounting of its patients' personal funds, and (B) includes the use of such separate account for such funds as will preclude any commingling of such funds with facility funds or with the funds of any person other than another such patient; and

(15) meets such other conditions relating to the health and safety of individuals who are furnished services in such institution or relating to the physical facilities thereof as the Secretary may find necessary (subject to the second sentence of section 1863 [42 USCS § 1395z] ), except that the Secretary shall not require as a condition of participation that medical social services be furnished in such institution; [.] Notwithstanding any other provision of law, all information concerning skilled nursing facilities required by this subsection to be filed with the Secretary shall be made available to Federal or State employees for purposes consistent with the effective administration of programs established under titles XVIII and XIX of this Act.

except that such term shall not (other than for purposes of subsection (a)(2)) include any institution which is primarily for the care and treatment of mental diseases or tuberculosis. For purposes of subsection (a)(2), such term includes any institution which meets the requirements of paragraph (1) of this subsection. The term "skilled nursing facility" also includes an institution described in paragraph (1) of subsection (y), to the extent and subject to the limitations provided in such subsection. To the extent that paragraph (6) of this subsection may be deemed to require that any skilled nursing facility engage the services of a registered professional nurse for more than 40 hours a week, the Secretary is authorized to waive such requirement if he finds that—

(A) such facility is located in a rural area and the supply of skilled nursing facility services in such area is not sufficient to meet the needs of individuals residing therein,

(B) such facility has one full-time registered professional nurse who is regularly on duty at such facility 40 hours a week, and

(C) such facility (i) has only patients whose physicians have indicated (through physicians' orders or admission notes) that each such patient does not require the services of a registered nurse or a physician for a 48-hour period, or (ii) has made arrangements for a registered professional nurse or a physician to spend such time at such facility as may be indicated as necessary by the physician to provide necessary skilled nursing services on days when the regular full-time registered professional nurse is not on duty.

kansas, Louisiana, New Mexico and Oklahoma.) In an attempt to clarify its interpretation, HCFA had established special criteria for identifying nursing homes that provide skilled nursing care ((j)(1)) but that are not necessarily skilled nursing facilities ((j)(1)–(15)). According to the government, Region VI's failure to properly apply these criteria led to an overabundance of nursing home patients eligible for Part B benefits in Texas.[3] The reclassification in Region VI brought it in line with the rest of the country.

The HCFA criteria were not published in the Federal Register until December 3, 1982,[4] but were apparently printed in section 3412 of the Medicare State Operations Manual long before that date. *See generally Kron, et al v. Heckler,* Medicare and Medicaid Guide (CCH) ¶ 33,105 at 10,550 (E.D.La. Sept. 12, 1983). The government maintains that the criteria have been in effect since 1966, shortly after the inception of the Medicare program. They were republished, slightly modified, in the Federal Register on March 22, 1984.[5] The republished criteria only apply to determinations of spells of illness under Part A, however, and do not affect the present case. The criteria now challenged are those published on December 3, 1982. (Hereafter, the De-

3. Affidavit of Jerry D. Sconce, Regional Administrator for HCFA Region 6, Exhibit D attached to Defendants' Memorandum in Support of Motion to Dismiss. Mr. Sconce indicated that there are 11,184 intermediate care facilities nationally. Approximately 1,139 of these, or 10%, were classified as not being (j)(1) facilities. In Region VI there are 1,664 intermediate care facilities, of which 899 are in Texas. In sharp contrast to the national norm of 10%, fully 67% of the 899 facilities in Texas were classified as not meeting the (j)(1) requirements. The patients in these nearly 600 non-(j)(1) homes were eligible for Part B benefits.

4. 47 Fed.Reg. 54,551 (1982). As published, the regulation provides that:

Criteria for Defining Skilled Nursing Facility Under Section 1861(j)(1) of the Social Security Act.

An institution meets the section 1861(j)(1) definition of 'skilled nursing or rehabilitation facility' only if all the following criteria are met.

A. Nursing Services.—Nursing services are provided under the direction or supervision of one or more registered nurses or licensed practical or vocational nurses without regard to whether they are 'waived.' This condition will be considered met even if the nurse is also the administrator of the facility or is employed on a part time basis.

B. 24-Hour Nursing Services.—There are nursing personnel on duty 24 hours a day. The term 'nursing personnel' includes registered nurses, licensed practical or vocational nurses without regard to whether they are 'waived' or not, practical nurses, student nurses, nursing aides, and orderlies.

C. Nurse-Bed Ratio.—The number of full-time equivalent nursing personnel to the number of beds is not less than an average ratio of 1 to 15 per shift.

Note.—Generally, there will be a close equivalency between the number of beds and average number of patients in an institution.

When the circumstances indicate a significant discrepancy in these factors, the ratio of nurses to the average patient census should be used in determining section 1861(j)(1) status.

A facility which has three 8-hour shifts would have to have a minimum of the equivalent of three full-time nursing personnel during a 24-hour period for each 15 beds. It is not necessary that the 1 to 15 ratio be maintained for each shift, but the average of all shifts must be at least 1 to 15. Nursing personnel include all those persons listed in paragraph B above. In determining the ratio, nurses who are also administrators should be counted as nursing personnel.

D. Other Services.—Bed and board are provided to inpatients in connection with the furnishing of nursing care, plus one or more medically related health services such as physicians' services, physical, occupational or speech therapy, diagnostic and laboratory services, and administration of medication. (Social, diversional, or recreational services provided by the institution would not be considered medically related health services.)

5. 49 Fed.Reg. 10,710 (1984). The modification adds the following:

Criteria for Defining a Skilled Nursing Facility Under Section 1861(j)(1) of the Social Security Act When Determining a Beneficiary's Spell of Illness Status.

\*    \*    \*    \*    \*    \*

E. Not Solely an Intermediate Care Facility.—The facility or part of a facility which is being classified is not—

1. Certified solely as an intermediate care facility, consistent with 42 CFR Part 442, Subpart E; or

2. Licensed by the State solely at a level or levels at or below the intermediate care facility (or a comparable) level.

cember 3, 1982 published criteria will be referred to as the "j(1) regulations.")

The j(1) regulations specify four requirements for determining whether a nursing home provides skilled nursing care. Plaintiffs have focused on the alleged inequities of the third requirement, nurse-bed ratio. By the same token, HCFA contends that it was the relaxed application of this third requirement that initially led Region VI astray. The third element of the j(1) regulations provides that the ratio of nursing personnel to the number of beds in a facility cannot exceed 1 to 15. A note following this provision indicates that in facilities with a low occupancy rate, the number of nursing personnel should be compared to the actual number of residents rather than the amount of beds. This note was apparently ignored in Region VI, with the result that ratios greater than 1 to 15 were found in numerous facilities with lower than average occupancy rates. When the number of nursing personnel was compared to the number of actual residents in those facilities, the resulting ratios were 1 to 15 or lower, thus leading to the reclassification of those homes.

## II. PROCEDURAL HISTORY

The reclassification of homes in Region VI became effective on September 1, 1984. On October 5, 1984, Plaintiffs filed their complaint seeking declaratory, injunctive and mandamus relief. After a detailed rendition of the circumstances surrounding this case, the complaint specifies nine requested forms of relief.

First, Plaintiffs request the Court to determine that this suit is maintainable as a class action. Next, Plaintiffs request a declaratory judgment with respect to five matters: (1) That Defendants' promulgation of the j(1) regulations violated the Administrative Procedure Act. (2) That Defendants' denial of Part B benefits violated Plaintiffs' right to due process of law. (3) That Defendants' actions denied Plaintiffs their right to equal protection under the law. (4) That Defendants' reclassification was contrary to the Medicare Act. (5) That the March 22, 1984 version of the j(1) regulations should apply in this case.

Plaintiffs next seek preliminary and permanent injunctive relief to prohibit HCFA Region VI from reclassifying nursing homes according to the j(1) regulations and to prohibit correspondence with homes for the same purpose. Finally, Plaintiffs request the Court to issue a writ of mandamus ordering the Defendants to promulgate the March 22, 1984 version of the j(1) regulations as the only interpretation of 42 U.S.C. § 1395x(j)(1).

The matter was set for hearing on November 5, 1984 to consider Plaintiffs' Motion for a Preliminary Injunction. At the start of the proceedings, the Court consolidated the hearing with the trial on the merits pursuant to Rule 65(a)(2) of the Federal Rules of Civil Procedure. At the conclusion of the trial, the Court ordered the filing of all briefs and the proposed Findings of Fact and Conclusions of Law from each side by November 26, 1984. This deadline was subsequently extended to November 30, 1984.

## III. JURISDICTION

Plaintiffs' complaint lists four different statutes that allegedly confer jurisdiction over this action on this Court: (1) Federal question jurisdiction under 28 U.S.C.S. § 1331 (Law.Co-op.Supp.1984); (2) jurisdiction under the Social Security Act pursuant to 42 U.S.C.S. §§ 405(g) and 1395ff (Law. Co-op.1973 & Supp.1984); (3) the power to issue declaratory and injunctive relief under 28 U.S.C.S. § 2201 (Law.Co-op.Supp. 1984) and Fed.R.Civ.P. 57 and 65; and (4) the power to compel public officials to perform duties owed to the plaintiffs pursuant to 28 U.S.C.S. § 1361 (Law.Co-op.1977).

On November 2, 1984, defendants filed a Motion to Dismiss alleging, among other things, that this Court lacked jurisdiction over the subject matter of this controversy. This assertion was based in large part upon the Supreme Court's most recent pronouncement concerning federal court jurisdiction over challenges to the Medicare system. *See Heckler v. Ringer,* — U.S. —, 104 S.Ct. 2013, 80 L.Ed.2d 622 (1984). The Court agrees with defendants that *Ringer* was intended to limit the jurisdiction of

federal district courts in a manner that precludes judicial determination of this matter.

### A. Jurisdictional Limitations: Background

The federal courthouse doors began to close on Medicare litigants in 1975. It was then that the Supreme Court emphasized the preclusive effects of the Social Security and Medicare Acts, finding that Congress intended to restrict most complaints concerning benefit denials to the administrative process. The Court's attention was focused on section 405(h) of the Social Security Act, the third sentence of which provides that:

> No action against the United States, the Secretary [of HHS], or any officer or employee thereof shall be brought under section 24 of the Judicial Code of the United States [28 U.S.C.S. § 1331 et seq.] to recover on any claim arising under this title.

42 U.S.C.S. § 405(h) (Law.Co-op.1973)[6]. The Medicare Act incorporates section 405(h) into its statutory framework. 42 U.S.C.S. § 1395ii (Law.Co-op.1973).

The predominance of § 405(h) was highlighted in *Weinberger v. Salfi*, 422 U.S. 749, 95 S.Ct. 2457, 45 L.Ed.2d 522 (1975). *Salfi* involved restrictions on the payment of Social Security benefits. A United States District Court for the Northern District of California invalidated a statutory minimum nine-month duration-of-relationship period that was a prerequisite to the payment of benefits to surviving wives and stepchildren of deceased wage earners. In ultimately reversing this decision, the Supreme Court initially examined the question of jurisdiction.

The Court first rejected the notion that section 405(h) does nothing more than require exhaustion of administrative remedies. Using this reasoning, the District Court had based its jurisdiction on 28 U.S. C.S. § 1331, despite the plain language of section 405(h). Noting that the first two sentences of section 405(h) guaranteed exhaustion of administrative remedies, the Supreme Court held that the third sentence of section 405(h) is "sweeping and direct" in stating that "*no* action shall be brought under section 1331." 422 U.S. at 757, 95 S.Ct. at 2463 (emphasis in original).

The Court subsequently considered what it termed "a more substantial argument." 422 U.S. at 760, 95 S.Ct. at 2464. Since the preclusive effect of section 405(h) is limited to claims arising under the Social Security Act, the plaintiffs argued that their claims arose under the Constitution. The Court conceded that their claims did arise under the Constitution, but stressed the fact that they also arose under the Social Security Act. 422 U.S. at 760, 95 S.Ct. at 2464. It was the Social Security Act that provided standing and substance, and it was Social Security benefits that plaintiffs wanted to recover. The Court concluded that "section 405(h) precludes resort to federal question jurisdiction for the adjudication of appellees' constitutional contentions." 422 U.S. at 761, 95 S.Ct. at 2465.

The Court found that the only avenue available for judicial review of Social Security claims was provided by section 405(g).[7]

**6.** The full text of 42 U.S.C.S. § 405(h) provides:
Finality of administrative determinations. The findings and decisions of the Secretary after a hearing shall be binding upon all individuals who were parties to such hearing. No findings of fact or decision of the Secretary shall be reviewed by any person, tribunal, or governmental agency except as herein provided. No action against the United States, the Secretary, or any officer or employee thereof shall be brought under section 24 of the Judicial Code of the United States to recover on any claim arising under this title.

**7.** 42 U.S.C.S. § 405(g) provides that:
Judicial review. Any individual, after any final decision of the Secretary made after a hearing to which he was a party, irrespective of the amount in controversy, may obtain a review of such decision by a civil action commenced within sixty days after the mailing to him of notice of such decision or within such further time as the Secretary may allow. Such action shall be brought in the district court of the United States for the judicial district in which the plaintiff resides, or has his principal place of business, or, if he does not reside or have his principal place of business within any such judicial district, in the United States District Court for the District of Columbia. As part of his answer the Secretary shall file a certified copy of the transcript of the record including the evidence upon

In *Mathews v. Eldridge*, 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976), section 405(g) was reduced to two elements. First, the potential litigant must present a claim for benefits to the Secretary. Second, the administrative remedies prescribed by the Secretary must be exhausted. The first element is jurisdictional; the second may be waived by the Secretary. The Medicare Act, however, did not incorporate all of section 405(g).[8]

After *Salfi* and *Eldridge*, it was clear that neither Social Security nor Medicare claimants could use section 1331 as a basis for jurisdiction because of the language of section 405(h). This was true whether or not the suit asserted constitutional claims. Little else, however, was clear.

In the years that followed, various Courts of Appeals struggled with jurisdictional disputes related to the Social Security and Medicare Acts. Some held that section 10 of the Administrative Procedure Act conferred jurisdiction when section 405(g) was unavailable. *See, e.g. Adams Nursing Home of Williamstown, Inc. v. Mathews*, 548 F.2d 1077, 1079 (1st Cir.1977) (suit to enjoin recapture regulation requiring repayment by provider of amount of invalidated depreciation); *Gallo v. Mathews*, 538 F.2d 1148, 1151 (5th Cir.1976) (suit by doctor to enjoin HHS from recovering excess Medicare payments); *Hunt v. Weinberger*, 527 F.2d 544, 546-7 (6th Cir.1975) (appeal from refusal of Secretary to reopen hearing on denial of claimant's Social Security disability benefits). This jurisdictional door was slammed shut in *Califano v. Sanders*, 430 U.S. 99, 107, 97 S.Ct. 980, 985, 51 L.Ed.2d 192 (1977) (reversing a Seventh Circuit opinion using section 10 of the APA as a jurisdictional foundation in a Social Security disability benefit appeal).

The Second, Fifth and Seventh Circuits determined that section 405(h) did preclude review of claims arising under the Medicare Act, but decided that the Court of Claims (now the United States Claims

---

which the findings and decision complained of are based. The court shall have the power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Secretary, with or without remanding the cause for a rehearing. The findings of the Secretary as to any fact, if supported by substantial evidence, shall be conclusive, and where a claim has been denied by the Secretary or a decision is rendered under subsection (b) hereof which is adverse to an individual who was a party to the hearing before the Secretary, because of failure of the claimant or such individual to submit proof in conformity with any regulation prescribed under subsection (a) hereof, the court shall review only the question of conformity with such regulations and the validity of such regulations. The court may, on motion of the Secretary made for good cause shown before he files his answer, remand the case to the Secretary for further action by the Secretary, and it may at any time order additional evidence to be taken before the Secretary, but only upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding; and the Secretary shall, after the case is remanded, and after hearing such additional evidence if so ordered, modify or affirm his findings of fact or his decision, or both, and shall file with the court any such additional and modified findings of fact and decision, and a transcript of the additional

record and testimony upon which his action in modifying or affirming was based. Such additional or modified findings of fact and decision shall be reviewable only to the extent provided for review of the original findings of fact and decision. The judgment of the court shall be final except that it shall be subject to review in the same manner as a judgment in other civil actions. Any action instituted in accordance with this subsection shall survive notwithstanding any change in the person occupying the office of Secretary or any vacancy in such office.

**8.** 42 U.S.C.S. § 1395ff(c) incorporates § 405(g) with regard to provider determinations only:

Any institution or agency dissatisfied with any determination by the Secretary that it is not a provider of services, or with any determination described in section 1866(b)(2) [42 USCS § 1395cc(b)(2) ], shall be entitled to a hearing thereon by the Secretary (after reasonable notice and opportunity for hearing) to the same extent as is provided in section 205(b) [42 USCS § 405(b) ], and to judicial review of the Secretary's final decision after such hearing as is provided in section 205(g) [42 USCS § 405(g) ].

Section 405(g) was also incorporated for the review of some cases arising due to denial of Part A benefits or the denial of eligibility under Part A or B. Part B amount disputes, such as in the present case, are not included. *See infra*, n. 9.

Court) had jurisdiction to hear Medicare claims against the United States seeking nothing more than a monetary judgment in excess of $10,000.00. *Bussey v. Harris*, 611 F.2d 1001, 1005 (5th Cir.1980); *Trinity Memorial Hospital v. Associated Hospital Service, Inc.*, 570 F.2d 660, 667 (7th Cir. 1977); *South Windsor Convalescent Home, Inc. v. Mathews*, 541 F.2d 910, 914 (2d Cir.1976). This alternative was not available in situations where equitable relief was requested. Except for minimal ancillary equitable jurisdiction, the Claims Court only hears suits for monetary damages. 28 U.S.C.S. § 1491 (Law.Co-op.Supp. 1984).

Through these and other methods, the Courts of Appeals continued to find jurisdictional loopholes for many claimants. There was a marked tendency to downplay the potential effect of *Salfi* and *Eldridge* on jurisdiction, since a literal reading of section 405(h) would preclude *all* jurisdiction. At least one court attributed this tendency to the fact that both *Salfi* and *Eldridge* had determined that jurisdiction was available under section 405(g). *Trinity Memorial Hospital v. Associated Hospital Service, Inc.*, 570 F.2d at 665–666. As a result, in cases where section 405(g) remedies were not available, the courts looked for other similar bases for jurisdiction.

This was often done in Medicare cases. While the Medicare Act incorporated the limitations of section 405(h), it did not include the remedies provided by section 405(g), thus necessitating a search for alternate jurisdictional bases. In an effort to limit the scope of such searches, the Su-

preme Court explored the remedies provided by the Medicare Act, particularly in Part B. *See United States v. Erika*, 456 U.S. 201, 102 S.Ct. 1650, 72 L.Ed.2d 12 (1981). This case is especially instructive in the matter at hand, which also involves Medicare Part B.

*Erika* involved a procedural challenge to the method employed by Medicare Part B carriers to pay for kidney dialysis supplies. The carriers determined the amount they would pay by referring to catalog prices from the previous year. The suppliers brought suit in the United States Claims Court seeking reimbursement for the difference between the current and the preceding year's prices.

The Supreme Court concluded that the Claims Court did not have jurisdiction. 456 U.S. at 206, 102 S.Ct. at 1653. In explaining its decision, the Court focused on the review provisions contained in the Medicare Act. While that Act did not incorporate section 405(g) (except as to providers, section 1395ff(c)), it did provide some limited opportunities for review of individual claims for Medicare benefits. 42 U.S.C.S. § 1395ff(b) (Law.Co-op.1973).[9]

The Supreme Court's discussion provides a good synopsis of the issues that are reviewable under the Medicare Act. An individual may seek review by the Secretary of determinations of his or her entitlement to benefits under Part A or Part B, and of the amount of benefits under Part A. If the individual disagrees with the Secretary's decision, review in federal court is available, but in only two instances: When the dispute relates to eligibility

---

**9.** 42 U.S.C.S. § 1395ff(b) provides that:

(b)(1) Any individual dissatisfied with any determination under subsection (a) as to—

(A) whether he meets the conditions of section 226 of this Act [42 USCS § 426] or section 103 of the Social Security Amendments of 1965 [42 USCS § 426(a)], or

(B) whether he is eligible to enroll and has enrolled pursuant to the provisions of part B of this title, or section 1818 [42 USCS § 1395i-2], or

(C) the amount of benefits under part A (including a determination where such amount is determined to be zero)

shall be entitled to a hearing thereon by the Secretary to the same extent as is provided in section 205(b) [42 USCS 405(b)] and to judicial review of the Secretary's final decision after such hearing as is provided in section 205(g) [42 USCS § 405(g)].

(2) Notwithstanding the provisions of subparagraph (C) of paragraph (1) of this subsection, a hearing shall not be available to an individual by reason of such subparagraph (C) if the amount in controversy is less than $100; nor shall judicial review be available to an individual by reason of such subparagraph (C) if the amount in controversy is less than $1,000.

under Parts A or B, or when the dispute concerns the amount of benefits to be awarded under Part A. 456 U.S. at 207, 102 S.Ct. at 1654; 42 U.S.C.S. § 1395ff(b).

■ Based on this, the Court concluded that Congress did not intend to provide any method for reviewing disputed amounts of Part B benefit determinations. The Court relied on the legislative history of section 1395ff(b), which expressed the belief in Congress that Part B disputes involved small amounts. The Court stated:

> Congress has specified in the Medicare statute that disputed carrier Part B determinations are to be subject to review in 'a fair hearing by the carrier, in any cases where the amount in controversy is $100 or more....'
>
> *   *   *   *   *   *
>
> Conspicuously, the statute fails to authorize further review for determinations of the amount of Part B awards. In the context of the statute's precisely drawn provisions, this omission provides persuasive evidence that Congress deliberately intended to foreclose further review of such claims.

456 U.S. at 206–208, 102 S.Ct. at 1653–54. In the eyes of Congress, allowing these disputes in federal courts would have overloaded them with "trivial matters." 456 U.S. at 210 n. 13, 102 S.Ct. at 1655 n. 13, *quoting* 118 Cong.Rec. 33992 (1972) (statement of Sen. Bennett).

Senator Bennett's use of the word "trivial" was perhaps unfortunate, since these matters are certainly not trivial to the individual claimants. The principle, however, can be seen in this case. If each plaintiff in this suit had filed separately, no single claim would even approach $10,000; all but two would be under $1,000. There is, of course, no minimum amount in controversy prerequisite to federal judicial review in these cases. There is simply no review available for disputes involving individual claims for Part B benefits.

That is the maxim of *Erika*. Even before *Erika*, several Courts of Appeals had recognized that the Medicare Act did not provide for judicial review of determinations of amounts of benefits under Part B.

*See, e.g. Drennan v. Harris,* 606 F.2d 846, 849 (9th Cir.1979); *Cervoni v. Secretary of HEW,* 581 F.2d 1010, 1015 (1st Cir.1978); *St. Louis University v. Blue Cross Hospital Service,* 537 F.2d 283 at 290 (8th Cir.); *Szekely v. Florida Med. Ass'n,* 517 F.2d 345, 348 (5th Cir.1975). Some Courts of Appeals, however, refused to extend *Erika* beyond the framework of individual Part B claims, noting that the decision in *Erika* was based on the wording of and legislative history behind section 1395ff(b). *See, e.g., Nat'l. Assn. of Home Health Agencies v. Schweiker,* 690 F.2d 932, 941 (D.C.Cir. 1982) (refusing to apply *Erika* to a claim brought under Part A of the Medicare Act).

One notable line of cases in this genre involves Medicare Part A payments for personal comfort items (such as telephones) in hospitals. Review of these cases is governed by 42 U.S.C.S. § 1395oo(g) rather than section 1395ff. Several Courts of Appeals have refused to follow the teaching of *Erika* in these cases since the requisite showing of a Congressional intent to limit federal court jurisdiction is not present for section 1395oo(g), unlike cases governed by section 1395ff and *Erika. See, e.g. Holy Cross Hospital et al v. Heckler,* Medicare and Medicaid Guide (CCH) ¶ 34,425, at 9110, 9112 (9th Cir. Dec. 21, 1984); *Arlington Hospital v. Heckler,* 731 F.2d 171, 173 (4th Cir.1984). The present case, however, does fall under section 1395ff, since it is in essence a claim for benefits under Part B, and these cases are therefore distinguishable.

Other Courts of Appeals refused to follow *Erika* even in cases involving individual claims under Part B that would seemingly be governed by section 1395ff. *See, e.g. College of American Pathologists (C.A.P.) v. Heckler,* 734 F.2d 859, 862–863 (D.C.Cir. May 11, 1984). In *C.A.P.,* the plaintiffs challenged regulations that limited Part B payments to clinical pathologists. The government challenged the court's jurisdiction because of section 405(h) and *Erika.* The court rejected the argument based on section 405(h) since the Secretary failed to identify "any alternative routes by which

appellants [could] secure judicial review." 734 F.2d at 862.

The court next turned to the *Erika*-based argument. The court began its analysis by noting that judicial review is presumed to be available absent a clear contrary congressional intent. *See Dunlop v. Bachowski,* 421 U.S. 560, 567, 95 S.Ct. 1851, 1857, 44 L.Ed.2d 377 (1975). The court then interpreted *Erika* as barring review of Part B amount determinations, since the legislative history behind section 1395ff evidenced such an intent. The court decided, however, that when these pathologists challenged regulations that reduced or eliminated the *amount* of the payments they received through Part B, they were not really seeking review of Part B amount determinations. Instead, the court construed their claims as "a challenge to the broad regulatory framework adopted by the Secretary," a matter that Congress did intend to have reviewed by federal courts. 734 F.2d at 863. A challenge to the "broad regulatory framework" was characterized as being procedural in nature and beyond the restrictions of *Erika.*

Prior to *Heckler v. Ringer,* —— U.S. ——, 104 S.Ct. 2013, 80 L.Ed.2d 622 (1984), at least two other Courts of Appeals employed this procedural exception. Following *Ringer,* both abandoned that approach. *See Michigan Academy of Family Physicians v. Blue Cross and Blue Shield of Michigan,* 728 F.2d 326 (6th Cir.1984), vacated and remanded for reconsideration in light of *Heckler v. Ringer,* 104 S.Ct. 2013, reversed, 751 F.2d 809 (6th Cir.1984); *Starnes v. Schweiker,* 715 F.2d 134 (4th Cir.1983), vacated and remanded for reconsideration in light of *Heckler v. Ringer,* 104 S.Ct. 2673, reversed, 748 F.2d 217 at 218 (4th Cir.1984).

The procedural exception was also applied in a trial court opinion heavily relied on by plaintiffs in this case. *Nat. Ass'n of Patients on Hemodialysis (NAPH) v. Heckler,* 588 F.Supp. 1108, 1116 (D.D.C. 1984). That court was convinced that the procedural exception applied in challenges to the Secretary's administration of the Part B program, as opposed to substantive challenges to the validity of particular ben-

efit determinations. Jurisdiction was present for procedural challenges but not for substantive challenges.

This distinction was somewhat arbitrary. If a *group* of plaintiffs challenged a regulation that affected amounts of benefits for a *group* of claimants, then the procedural exception was used to justify jurisdiction. If a single plaintiff challenged a particular determination affecting the amount of his or her benefits, *Erika* barred jurisdiction. In reality, both situations involve amounts of Part B benefits. There are only two real differences: First, procedural cases involve more than one plaintiff, and second, the decision of the Secretary challenged in procedural cases is usually in the form of a regulation. The Supreme Court eliminated this procedural distinction in *Heckler v. Ringer,* and thereby closed another door on Part B claimants.

### B. Jurisdictional Limitations: Heckler v. Ringer

■ Up to the time of *Heckler v. Ringer,* numerous inroads had been made on federal court jurisdiction over Medicare Part B disputes like the case at bar. By giving a literal reading to section 405(h) (incorporated into the Medicare Act by section 1395ii), *Salfi* foreclosed federal question jurisdiction based on section 1331. *Salfi* also dismissed the notion that these claims could arise under the Constitution, independent of the Social Security or Medicare Acts. *Sanders* closed the door on cases based solely on section 10 of the Administrative Procedure Act. *Erika* relied on section 1395ff(b) to eliminate all judicial review of determinations concerning amounts of benefits to be awarded to Medicare Part B claimants.

At this point, there were two potential bases for jurisdiction left open to plaintiffs in cases such as the present one: The procedural exception and mandamus. The procedural exception was eliminated as a possibility by *Heckler v. Ringer.*

*Ringer* involved the denial of Medicare Part A coverage for a surgical procedure known as bilateral carotid body resection

(BCBR), a technique used primarily for relieving respiratory distress. In January of 1979, HCFA ordered the cessation of Medicare Part A payments for BCBR because of questions concerning its safety and effectiveness. *Ringer*, 104 S.Ct. at 2018. The decision to withhold payments for BCBR was finalized on October 28, 1980, in a formal administrative ruling from the Secretary of HHS.

The respondents in *Ringer* were four Medicare claimants who were denied payments for BCBR surgery. Three had already had surgery performed; the fourth wanted it but could not afford it without assurances that Medicare would pay part of the costs. Though the Court distinguished those respondents who had received the surgery from the one who had not, the results for all four were the same: the federal courts did not have jurisdiction to hear their claims.

The respondents as a group attempted to utilize the procedural exception by challenging the regulation—"the broad framework"—that prohibited payment for BCBR surgery. The court rejected the idea that this sort of challenge involved anything more than a dispute over the amount of benefits available, a matter barred from judicial review in Part B cases by *Erika*. The court concluded that:

> We disagree in particular with [the Court of Appeals'] apparent conclusion that simply because a claim somehow can be construed as "procedural," it is cognizable in federal district court by way of federal question jurisdiction.

104 S.Ct. at 2021.

The Court then returned to the principles of *Salfi* and *Matthews v. Eldridge*, noting that section 405(h) bars federal question jurisdiction over all claims arising under the Social Security or Medicare Acts. If the suit arises under one of these Acts, jurisdiction is precluded regardless of whether the claim may be labelled as "procedural" rather than "substantive." 104 S.Ct. at 2022. Challenges to the regulatory framework are "inextricably intertwined" with claims for benefits that are barred by

section 405(h) and, in this case, by section 1395ff(b). 104 S.Ct. at 2027.

Plaintiffs in this case have asserted that *Ringer* does not affect their right to judicial review. They argue that this case involves "the administration of the Medicare Act," while *Ringer* was concerned with "a reimbursement amount dispute." *See, e.g.* Plaintiffs' Supplemental Memorandum of Points and Authorities in Support of Plaintiffs' Motion for Summary Judgment at 5. This is nothing more than a rehashing of the procedural exception, the very argument rejected by the Court in *Ringer*. This case arises under the Medicare Act, and is, therefore, proscribed by section 405(h).

Plaintiffs also maintain that *Ringer* is distinguishable since it dealt with Part A, rather than Part B, of the Medicare Act. It is difficult to see any effect from this distinction. *Ringer* was based in large part on the language consecrated in section 405(h), a provision that covers both Parts A and B of the Medicare Act by virtue of 42 U.S.C.S. § 1395ii. Section 405(h) therefore bars all suits arising under the Medicare Act, whether based on Part A or Part B, except as otherwise provided in the Act. (*See* discussion of 1395ff(b) and *Erika, supra* at 1479–1480). In addition, the two Courts of Appeals decisions that were reversed after reconsideration in light of *Ringer* involved Medicare Part B. *Starnes v. Schweiker*, 748 F.2d 217 at 218 (involved a challenge to Part B reimbursement ceilings for computerized tomography ("CT") scans); *Michigan Academy v. Blue Cross and Blue Shield*, 751 F.2d 809 (involved carrier limitations on physician reimbursement under Part B). This Court agrees that *Ringer* affects Part B cases as well as Part A cases.

Plaintiffs also assert that this Court has jurisdiction despite *Ringer* because they are challenging a regulation purportedly in conflict with the Medicare Act. This is a description of plaintiffs' claim and does not by itself confer jurisdiction upon this Court. Whether or not plaintiffs are correct in their assessment of the challenged

regulation, they must show some independent basis for jurisdiction. The Administrative Procedure Act, mentioned in the plaintiffs' assertion concerning the invalidity of the challenged regulation, cannot provide this independent basis. This fact was established in *Salfi* and *Sanders* and reaffirmed in *Ringer*. See *Ringer,* 104 S.Ct. at 2025–2026.

Plaintiffs also cite numerous cases in support of their jurisdictional arguments. Two of the most recent, *Starnes* and *Michigan Academy,* were reversed in light of *Ringer,* as noted previously. The other cases were decided prior to *Heckler v. Ringer,* and relied, at least in part, on the procedural argument repudiated by *Ringer. See, e.g. College of American Pathologists v. Heckler,* 734 F.2d at 862–863 (relies on procedural exception); *Nat'l Ass'n of Home Health Agencies v. Schweiker,* 690 F.2d 932 (D.C.Cir.1982) (same); *Whitecliff, Inc. v. United States,* 210 Ct.Cl. 53, 536 F.2d 347, 351 (1976) cert. den., 430 U.S. 969, 97 S.Ct. 1652, 52 L.Ed.2d 361 (finding jurisdiction in a Part B case because no remedies were provided in the statute). Some of the other cases are clearly distinguishable from the one at hand. *See, e.g. United States v. Aquavella,* 615 F.2d 12, 20–21 (2d Cir.1979) (holding that section 405(h) applies only to actions brought against the government, and not to those brought by the government).

Plaintiffs also continue to rely on *N.A. P.H. v. Heckler,* 588 F.Supp. 1108, a district court case from the District of Columbia that relied on the procedural distinction argument. Even after *Ringer,* that court refused to abandon the procedural exception. No. 83–2210, slip op. at 2 (D.D.C. July 20, 1984). This Court is unpersuaded by the reasons given by that court for distinguishing *Ringer.* In addition, another district court from the District of Columbia has recently followed *Ringer* in dismissing for want of jurisdiction a challenge to the Medicare reimbursement rates for kidney dialysis. *Slifkin, et al. v. Heckler,* No. 82–0883 (D.D.C. Sept. 24, 1984).

The Fifth Circuit has also recognized the limitations imposed on jurisdiction over Medicare disputes as a result of *Salfi* and

*Ringer's* interpretation of section 405(h). *Smith v. North Louisiana Medical Review Ass'n,* 735 F.2d 168, 171–172 (5th Cir.1984). Section 405(h) therefore closes the door on the procedural distinction and on federal question jurisdiction in this case. There is no jurisdiction in this case—no jurisdiction, that is, unless plaintiffs can squeeze through the last open door.

### C. Mandamus Jurisdiction

Numerous courts have held that the barrier erected by section 405(h) does not reach mandamus jurisdiction pursuant to 28 U.S.C.S. § 1361 (Law.Co-op.1977). *See, e.g. National Association of Rehabilitation Facilities, Inc. v. Schweiker,* 550 F.Supp. 357, 362 (D.D.C.1982); *McMahon v. Califano,* 476 F.Supp. 978, 980–984 (D.Mass.1979). Some courts reached this conclusion by relying on the procedural distinction since repudiated in *Ringer,* holding that section 405(h) does not bar mandamus jurisdiction over procedural challenges. *See, e.g., Ellis v. Blum,* 643 F.2d 68, 82 (2d Cir.1981). Still other courts have decided that section 405(h) does preclude mandamus jurisdiction. *See, e.g. Northeast Emergency Medical Associates v. Califano,* 470 F.Supp. 1111, 1118 (E.D.Pa.1979) ("Section 405(h) does not simply dissolve whenever an aggrieved claimant invokes the mandamus statute.") *Medical Center of Independence v. Califano,* 433 F.Supp. 837, 841 (W.D.Mo.1977), aff'd on other grounds, 628 F.2d 1113 (8th Cir.1980) ("The preclusion set forth in § 405(h) of the Social Security Act applies equally to actions brought under 28 U.S.C. § 1361."). Finally, some courts have refused to employ mandamus jurisdiction because they found that their plaintiffs did not satisfy the prerequisites. *See, e.g. St. Francis Hospital Center v. Schweiker,* 544 F.Supp. 1167, 1173–1174 (S.D.Ind.1982), affirmed, 714 F.2d 872 (7th Cir.1983).

The Supreme Court has consistently sidestepped the question of whether the scope of section 405(h) includes mandamus jurisdiction. In some cases the court found it unnecessary since review was available

through section 405(g). *Califano v. Yamasaki*, 442 U.S. 682, 698, 99 S.Ct. 2545, 2556, 61 L.Ed.2d 176 (1979); *Mathews v. Eldridge*, 424 U.S. at 332 n. 12, 96 S.Ct. at 901 n. 12. In other instances, the Court has determined that there was no merit to the mandamus claims. *Heckler v. Ringer*, 104 S.Ct. at 2023; *Norton v. Mathews*, 427 U.S. 524, 528–533, 96 S.Ct. 2771, 2773–76, 49 L.Ed.2d 672 (1976).

The Supreme Court's position is somewhat misleading, however, since both *Ringer* and *Norton* "assume without deciding" that mandamus jurisdiction is *not* foreclosed by the third sentence of section 405(h). It would be unnecessary to examine the requirements for section 1361 if section 405(h) closed the door on such review, yet *Ringer* did examine those requirements. 104 S.Ct. at 2022–2023. This Court is more inclined to agree with the two district courts cited above that held that section 405(h) does not vanish whenever a plaintiff calls for mandamus. If the third sentence of section 405(h) is to be read literally, it precludes all judicial review, including mandamus.

This Court, however, may also "assume without deciding" that mandamus jurisdiction exists despite section 405(h), since the plaintiffs in this case have failed to provide the prerequisites for mandamus relief. This alternative seems to be the safer path, given the treatment of section 1361 in previous Supreme Court decisions.

The mandamus door is narrow. Mandamus is an extraordinary remedy reserved for extraordinary circumstances. *Southern Pacific Transportation v. The City of San Antonio, Texas*, 748 F.2d 266, 270 (5th Cir.1984). In general, a party seeking mandamus relief must satisfy three requirements. First, the party seeking relief must have no other adequate means available for reviewing his claim. Second, the party must show that his right to mandamus relief is "clear and indisputable." Finally, the party must persuade the court that issuance of a writ is necessary, since its issuance is largely a matter of judicial discretion. *See Kerr v. United States District Court*, 426 U.S. 394, 403, 96

S.Ct. 2119, 2124, 48 L.Ed.2d 725 (1976). The arguments to support each of these elements are set out below.

### 1. Alternatives for Review

Administrative procedures have been established to review Medicare Part B amount determinations that could be used by plaintiffs in this case. 42 C.F.R. § 405.801 et seq. (1983). It is unlikely, however, that any benefit would be derived by following the established procedures.

When the amount in controversy exceeds $100, a dissatisfied Part B claimant may request a hearing by the private insurance carrier to review a denial of Part B benefits. 42 C.F.R. § 405.801. The carrier must hold a hearing within 60 days, at which time an initial determination is made concerning the original denial of benefits. 42 C.F.R. § 405.803. Within six months after the initial determination, the claimant may seek further review by the carrier. 42 C.F.R. § 405.807. The carrier shall then make a final review determination. 42 C.F.R. § 405.810. Within six months after the final review determination, a claimant may request a hearing before a hearing officer designated by the carrier. 42 C.F.R. §§ 405.820–405.822. The hearing officer will then make written findings of fact and a statement of reasons. 42 C.F.R. § 405.835.

While plaintiffs in this case have not exhausted these procedures, it is unlikely that they would have been successful anyway. Both the carrier reviewers and the hearing officer are bound by the regulations promulgated by the Secretary in furtherance of the Medicare Act. 42 C.F.R. § 405.860. These reviewers could not have changed the regulations challenged in this case. At best, they could only have double checked HCFA's reclassification of the nursing homes involved.

Plaintiffs have not exhausted all the remedies provided. To do so, however, would have been an act of futility. Plaintiffs' plea for mandamus relief could, therefore, be construed in a manner that satisfies the

first requirement. It fails, however, on the other two.

## 2. Clear and Indisputable Right to Relief

The plaintiffs must establish that the Secretary owes them a clear, nondiscretionary duty to pay their claims for Part B benefits. *See Ringer,* 104 S.Ct. at 2023. Once this is established, a court could order the Secretary to comply with this duty. Absent this, however, mandamus relief is not appropriate.

There is no clear, nondiscretionary duty to pay Part B benefits to the present plaintiffs. Potential payees must first meet eligibility requirements. Eligibility for payments covering items like durable medical equipment is determined both by statute and regulation. While the statute broadly defines the types of benefits available, the Secretary is accorded the discretion to promulgate regulations that more specifically define individual entitlements to those benefits. 42 U.S.C.S. § 1395ff(a) (Law.Co-op.1973).

The exercise of this discretion was acutely necessary in the area of durable medical equipment. The Medicare Act prohibits Part B payments for equipment to residents of "j(1)" facilities. 42 U.S.C.S. § 1395x(n). The language of j(1) is somewhat circular however, since it provides that a "skilled nursing facility" is one that provides "skilled nursing care and related services." 42 U.S.C.S. § 1395x(j)(1). In order to clarify this definition, the Secretary promulgated the j(1) regulations that plaintiffs have now attacked.

In promulgating the j(1) regulations, however, the Secretary was exercising the broad discretion delegated to her by Congress. Nothing in the statute suggests that the Secretary's interpretation constitutes an abuse of that discretion. The statute itself provides little information on the aspects of j(1) facilities. The Secretary used her knowledge and resources to interpret Congressional intent, and embodied the results of that process in the j(1) regulations.

■ Plaintiffs maintain that the Secretary misread the intent of the Medicare Act

in this instance. It is well established, however, that "interpretations of a statute by the agency charged with its administration should weigh heavily absent a compelling reason to the contrary." *Sun Towers, Inc. v. Heckler,* 725 F.2d 315, 324 (5th Cir.1984) (upholding the Secretary's interpretation of another section of the Medicare Act), citing *Red Lion Broadcasting Co. v. F.C.C.,* 395 U.S. 367, 381, 89 S.Ct. 1794, 1802, 23 L.Ed.2d 371 (1969). Plaintiffs have provided no compelling reason to reject the Secretary's interpretation in this case.

■ Even more important is the fact that the j(1) regulations were a product of discretion. There is no duty created by the statute that requires the payment of Part B benefits to the plaintiffs in this case. The Secretary's discretionary decision concerning the definition of j(1) facilities provided the foundation for the denial of the claims submitted by the present plaintiffs. There is no clear, nondiscretionary duty that the Secretary has ignored. Mandamus relief is inappropriate under these circumstances. *See, e.g. Heckler v. Ringer,* 104 S.Ct. at 2003.

## 3. Judicial Discretion

■ The issuance of a writ of mandamus is a matter of discretion for the court reviewing the petition. *Overton v. City of Austin,* 748 F.2d 941, 958 (5th Cir.1984). Given the failure of plaintiffs to satisfy the preceding two prerequisites, the issuance of a writ in this case would be improper. Beyond this, however, plaintiffs have failed to provide any compelling reason that could have justified the use of this extraordinary remedy.

The testimony of Jerry D. Sconce, Regional Administrator for HCFA Region VI, indicates that even after the challenged reclassification of nursing homes, Medicaid will continue to provide $29.96 per day to cover a variety of expenses including durable medical equipment. Tr. at 14. Medicaid inspectors insure that the various nursing homes are adequately meeting their patients' equipment needs. Eighty-five percent of the patients in the affected homes are eligible for Medicaid. Tr. at 15.

While it is true that Medicaid will not cover expenses for oxygen contents, these costs are relatively low. Millard Phillips, formerly a plaintiff in this case prior to his death, was the only named party who required oxygen contents. His costs for that item were $86.40 for the period from October 31, 1983 to November 8, 1984. *See* Exhibit J attached to the Post-Trial Memorandum of Defendant. Medicaid does cover the costs of oxygen equipment. Texas Department of Human Resources ICF/SNF Standards for Participation, Ch. XII, § B, Exhibit 4 attached to the Memorandum and Points and Authorities in Support of Plaintiffs' Motion for Preliminary Injunction.

Plaintiffs argue that requiring these nursing homes to provide durable medical equipment out of this Medicaid allowance will create a hardship on the homes. *See, e.g.* Affidavit of Nell Casey, Exhibit 7 attached to the Memorandum and Points and Authorities in Support of Plaintiffs' Motion for Preliminary Injunction. Part B benefits have only been exploited since 1980, however, meaning that these homes formerly were able to provide equipment on the Medicaid allowance. *See, e.g.* Affidavit of Ann Maxwell, Exhibit 19 attached to Plaintiffs' Memorandum; Affidavit of Ernest W. White, Exhibit 10 attached to Plaintiffs' Memorandum. In addition, as Mr. Sconce pointed out, one-third of these homes were never eligible for Part B benefits for their patients, yet they provided necessary equipment.

The preceding was merely a thumbnail sketch of the issues involved in this case, but it clearly demonstrates that plaintiffs have failed to demonstrate any exceptional circumstances that warrant the extreme remedy of mandamus. *See, e.g. Smith v. North Louisiana Medical Review Assn,* 735 F.2d at 172–173. This Court will not exercise its discretion to grant plaintiffs their requested relief.

### D. The Necessity for Judicial Review

At this point, there are apparently no doors left open for the plaintiffs in this case. There is, however, one last argument used by plaintiffs to distinguish *Ringer* and other cases limiting jurisdiction, and on its face it is quite attractive. They maintain that since there is essentially no administrative review available to them, they will have no remedy whatsoever if this Court lacks jurisdiction. This result, they argue, would be unconstitutional.

The presumption in favor of some sort of review, preferably by a court, is at the heart of the decisions recognizing the existence of jurisdiction over Medicare claimants. When the Supreme Court emphasized the preclusive effect of section 405(h) in *Salfi* and *Sanders,* they knew that section 405(g) provided some manner of review. *Califano v. Sanders,* 430 U.S. at 109, 97 S.Ct. at 986; *Weinberger v. Salfi,* 422 U.S. at 762, 95 S.Ct. at 2465. As noted earlier, when section 405(g) did not apply, some courts still recognized that section 405(h) barred federal question jurisdiction, but only because review was available in the Claims Court. *See, e.g. Drennan v. Harris,* 606 F.2d at 850 (9th Cir.); *Dr. John T. MacDonald Foundation, Inc. v. Califano,* 571 F.2d 328, 332 (5th Cir.) (en banc), cert. denied, 439 U.S. 893 (1978); *Trinity Memorial Hospital of Cudahy, Inc. v. Associated Hospital Service, Inc.,* 570 F.2d 660, 667 (7th Cir.1977).

When review in the Claims Court was not available, and when section 405(g) could not be utilized, many courts decided that they could exercise federal question jurisdiction over Medicare claims, regardless of section 405(h). *See, e.g. Colonial Penn Ins. Co. v. Heckler,* 721 F.2d 431, 437 (3rd Cir.1983); *N.A.H.H.A. v. Schweiker,* 690 F.2d 932 (D.C.Cir.1982), cert. denied, 459 U.S. 1205, 103 S.Ct. 1193, 75 L.Ed.2d 438 (1983); *Chelsea Community Hospital v. Michigan Blue Cross Association,* 630 F.2d 1131, 1135 (6th Cir.1980); *St. Louis University v. Blue Cross Hospital Service,* 537 F.2d 283 (8th Cir.), cert. denied 429 U.S. 977, 97 S.Ct. 484, 50 L.Ed.2d 584 (1976). Without review in the Claims Court or under section 405(g) (or some similar provision), these courts concluded that a literal

reading of section 405(h) would preclude all judicial review. As the Supreme Court explained in *Salfi*,

> [n]ot only would such a restriction have been extraordinary, such that "clear and convincing" evidence would be required before we would ascribe such intent to Congress, but it would have raised a serious constitutional question of the validity of the statute as so construed.

*Salfi*, 422 U.S. at 762, 95 S.Ct. at 2465 (citations omitted). The courts that exercised jurisdiction despite section 405(h) based their decision on the last clause of that sentence from *Salfi*. One of them concluded:

> Every court that has considered the issue has agreed that section 405(h) should be read so as to permit *some* avenue of judicial review for *constitutional* claims.

*N.A.H.H.A.*, 690 F.2d at 939 (emphasis in original).

This statement is far too broad, however. The language in *Salfi* cautioned against an interpretation of section 405(h) that would preclude constitutional challenges to the statutes themselves, since these claims arise solely under the constitution. *Salfi* did not intend to prohibit an interpretation of section 405(h) that would preclude constitutional challenges to the *administration* of the statute, such as in this case, since these types of constitutional challenges arise both under the statute and the constitution.[10] The *Salfi* court concluded that in this latter situation, section 405(h) should be read to preclude judicial review:

> [I]t is just as fruitless to argue that this action does not arise under the Social Security Act [as well as under the Constitution]. For not only is it Social Security benefits which appellees seek to recover, but it is the Social Security Act which provides both the standing and the substantive basis for the presentation of their constitutional contentions.

\*  \*  \*  \*  \*  \*

> This being so, the third sentence of § 405(h) precludes resort to federal-question jurisdiction for the adjudication of appellees' constitutional contentions.

*Salfi*, 422 U.S. at 761, 95 S.Ct. at 2464–65.

The present case is substantively identical to *Salfi* on this point. Plaintiffs are seeking Medicare Part B benefits. It is the Medicare Act that provides both their standing and the "substantive basis for the presentation of their constitutional questions." As a result, their claims arise under the Medicare Act, and review of their claims is likewise limited by the Medicare Act. *Heckler v. Ringer* reiterates that what matters is not whether a claim concerns procedural matters, but rather whether a claim "arises under" the statute. *Ringer*, 104 S.Ct. at 2022. Since the present case does "arise under" Part B of the Act, judicial review of plaintiffs' constitutional allegations as federal questions is precluded by section 405(h).

There are two reasons why no constitutional issue is raised by this jurisdictional barricade. First, constitutional challenges are cognizable if they are aimed at the Medicare Act itself. Such claims arise solely under the Constitution, and therefore escape section 405(h)'s grasp.[11]

---

**10.** The language in *Salfi* was drawn from *Johnson v. Robison*, 415 U.S. 361, 94 S.Ct. 1160, 39 L.Ed.2d 389 (1974). In *Robison*, a draftee accorded conscientious objector status challenged a statute excluding him and those like him from eligibility for Veteran's Administration educational benefits. Section 211(a) of the Veterans' Readjustment Benefits Act bars judicial review of decisions made by the Administrator of Veteran's Affairs. 38 U.S.C.S. § 211(a) (Law.Co-op. 1973). In that sense, it is similar to section 405(h), which bars review of the administration of the Social Security and Medicare Acts. The Court held that § 211(a) did not prohibit jurisdiction in *Robison*, since Robison was attacking the statute itself and not the administration of the program created by the statute. As such, the questions presented arose solely under the Constitution. Section 211(a), like § 405(h), only prohibits review of cases arising under the relevant Act. 415 U.S. at 367, 94 S.Ct. at 1165.

**11.** The *Colonial Penn* case provides an excellent example of the type of constitutional challenge that can be reviewed under federal question jurisdiction despite § 405(h). *Colonial Penn Ins. Co. v. Heckler*, 721 F.2d 431. Congress amended the Medicare Act in 1980. As modified, the Act withheld Medicare payments for accidental injuries if they were also covered by

Second, Congress clearly intended to block federal question jurisdiction in cases challenging the amount of Part B benefits. *United States v. Erika*, 456 U.S. at 208–211, 102 S.Ct. at 1654–55. This clear Congressional intent overcomes any presumption in favor of judicial review.

After *Heckler v. Ringer*, the present case can be construed as nothing more than · a claim for Part B benefits—an amount dispute. Medicare claimants may no longer blur the lines drawn by Congress by arguing that they are challenging the Secretary's administration of the Medicare program, when in reality their ultimate desire is the continued payment of Part B benefits.

There is no review available to plaintiffs in this case.

### IV. SUMMARY

At the outset of this discussion on jurisdiction, the Court listed the four bases for jurisdiction relied on by the plaintiffs. The first, federal question jurisdiction under 28 U.S.C.S. § 1331, is precluded by section 405(h) of the Social Security Act.

The second, remedies provided by the Medicare Act in 42 U.S.C.S. § 1395ff, are unavailable to the present plaintiffs. The administrative review provided by the Secretary is nearly useless to plaintiffs here, since the carrier reviewers are bound by the Secretary's j(1) regulations. No other form of review is available to Part B claimants under the Act. *United States v. Erika*, 456 U.S. 201, 102 S.Ct. 1650.

■ The third, the power of federal courts to issue declaratory and injunctive relief, cannot provide the independent basis for jurisdiction plaintiffs need. *See Mission Insurance Co. v. Puritan Fashions Corp.*, 706 F.2d 599, 601 (5th Cir.1983) (Declaratory Judgment Act does not provide

an independent basis for jurisdiction); *Citizens Concerned for Separation of Church and State v. City and· County of Denver*, 628 F.2d 1289, 1298–1299 (10th Cir.1980) (Rule 65 power to enjoin does not provide jurisdiction); *Lake Lansing Special Assessment Protest Assoc. v. Ingham County*, 488 F.Supp. 767, 772 (W.D.Mich.1980) (same).

The fourth, mandamus jurisdiction, is unavailable to these plaintiffs primarily because of the discretionary nature of the challenged conduct.

Numerous other potential bases for jurisdiction have been discussed and rejected. Under these circumstances, plaintiffs have failed in their duty to affirmatively demonstrate the existence of jurisdiction. There is no basis for federal judicial jurisdiction over disputes arising under the Medicare Act that either directly or indirectly involve the amount of Part B benefits. Constitutional challenges to the provisions of the Medicare Act itself are allowed since they arise solely under the constitution. This, however, is not the question presented in this case. The remedy for these plaintiffs lies in Congress.

It is accordingly ORDERED that all claims for relief against defendant Margaret M. Heckler and Carolyne K. Davis are hereby DISMISSED, and that the named plaintiffs in the above-entitled and numbered cause take nothing by virtue of their claims against said defendants. Costs are to be borne by the respective parties.

an automobile or liability insurance policy. Colonial Penn brought suit to enjoin enforcement of the statute and related regulations. They argued that they had set rates on their liability policies on the assumption that Medicare would cover most of the medical expenses. As a result of the amendment, the risk to Colonial Penn was substantially increased, thereby leading to unlawful deprivations of property every time

they were forced to pay the extra medical bills. In this case, Colonial Penn was leveling a constitutional challenge at the statute, i.e., the Medicare Act itself. Their claim did not arise under the Medicare Act, but arose solely under the Constitution. 721 F.2d at 437. As a result, § 405(h), which applies only to cases arising at least in part under the Medicare Act, did not affect the court's jurisdiction.